**Opinion issued October 30, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00802-CR

————————————

**JAMARCUS RENARD TOLIVER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1718477**

## O P I N I O N

A jury found appellant, Jamarcus Renard Toliver, guilty of the felony

offense of murder[1] and assessed his punishment at confinement for fifteen years.

In two issues, appellant contends that the trial court erred in instructing the jury.

---

[1]     *See* TEX. PENAL CODE ANN. § 19.02(b), (c).

We affirm.

## Background

Moesha Johnson ("Moesha") testified that the complainant, Joseph Lewis, was her boyfriend and the father of her children. Moesha further explained that appellant and the complainant were friends, and in 2016, Moesha met appellant through the complainant. Moesha and appellant became friends as well.

Before the complainant's death, Moesha, the complainant, and their two children lived in an apartment at the Tropical Motel in Harris County, Texas. Moesha noted that while inside the apartment, she could hear things going on outside because neither the windows nor the walls were very thick.

Moesha testified that on April 11, 2021, she arrived at the apartment at the Tropical Motel around 11:00 a.m. or 12:00 p.m. and appellant was there with the complainant. At some point, around noon, the complainant and appellant left the apartment in appellant's white car[2] and went to the mall; Moesha stayed behind. Around 2:00 p.m. or 3:00 p.m., as she was falling asleep, Moesha heard a car pull up in the parking lot near the apartment. Next, Moesha heard a gunshot and the car's doors open. She then heard another gunshot less than a minute after the first.

---

[2] Moesha identified the car that appeared in a videotaped recording from the Tropical Motel's surveillance camera on April 11, 2021 as appellant's "White Malibu-like" car.

2

Moesha looked out the window of her apartment and saw appellant's car pulling away and the complainant "laying there." Moesha ran out of the apartment and over to the complainant. The complainant had "blood . . . coming from his head" and was not responsive. Moesha found appellant's cellular telephone near where the complainant had been shot. After law enforcement officers arrived, Moesha identified appellant as the person who shot the complainant, and she gave a law enforcement officer appellant's cellular telephone.

Moesha did not know about any disagreement appellant and the complainant might have had on April 11, 2021; she did not know if they had one or if they did not have one. She described appellant's and the complainant's relationship as "a good relationship."

Moesha testified she owned two firearms that were kept in the apartment, but she stated that she and the complainant never really carried them. The day after the shooting, Moesha discovered that one of the firearms was missing. Moesha testified that she did not know if the complainant had a firearm with him on April 11, 2021. According to Moesha, appellant usually carried a firearm, but she did not know what type it was.

Moesha later identified appellant in a photographic array as the person who shot the complainant. She noted that she did not actually see the shooting because she was inside her apartment, but she did know that the complainant was with

3

appellant in appellant's car on April 11, 2021, and she saw appellant's car drive away after the complainant was shot. She did not know what happened in the car between appellant and the complainant.

Houston Police Department ("HPD") Officer C. Merka testified that on April 11, 2021, he was dispatched to the Tropical Motel located at 4831 North Shepherd in Harris County in response to a shooting. Upon arrival, Merka saw the complainant lying on the ground and Moesha "over him." Moesha was distraught. The complainant was not moving and appeared to be unconscious; he had sustained a gunshot wound to the head. Moesha identified appellant as the person who shot the complainant, and she gave Merka appellant's cellular telephone.[3] Witnesses identified a white Chevy Malibu as the car involved in the shooting. According to Merka, he did not see a firearm on the complainant's person. Merka had no information as to whether the complainant had been shot in self-defense.

While at the Tropical Motel, Officer Merka viewed a videotaped recording from the motel's surveillance camera. The trial court admitted the videotaped recording into evidence during Merka's testimony, and it showed a white car pulling into the entrance of the Tropical Motel. The car then drove into the parking lot and stopped in the middle of the parking lot; it did not park in a parking

---

[3] Harris County District Attorney's Office Investigator Nathan Gates testified that he performed a forensic analysis on the cellular telephone given to Officer Merka, and it revealed the device's name as "Jamarcus' iPhone." (Internal quotations omitted.)

space. Movement occurred in the driver's seat of the white car. The front passenger's side door then opened, as did the front driver's side door. The driver exited the car and then turned around to face back toward the inside of the car, holding a firearm. The firearm was pointed inside the car. The driver subsequently dropped something and picked it up. He then pointed the firearm inside the car. Next, the driver got back in the car, and the body of a person rolled out of the front passenger's side door and onto the ground. The driver put his car in reverse and backed over the body on the ground. The front passenger's side door closed while the car was in reverse. After backing up a bit, the white car drove out of the parking lot and away from the scene. The passenger from the car remained lying on the ground, not moving. Before emergency assistance arrived, a woman on the videotaped recording could be seen picking up something off the ground, which was in the area where the driver of the white car was previously standing.

While watching the videotaped recording at trial, Officer Merka explained that because the firearm was discharged inside the car, any casing would have been ejected inside the vehicle and not left on the ground. According to Merka, after the shooting, the white Chevy Malibu exited the Tropical Motel's parking lot, driving in the direction opposite the nearest police station.

HPD Sergeant E. Martinez testified that he was assigned to investigate the complainant's shooting. As part of his investigation, Martinez determined that appellant had a white Chevy Malibu registered in his name.

Further, during his investigation, Sergeant Martinez evaluated whether "self-defense was at issue," but he testified that he did not know whether anyone acted in self-defense on April 11, 2021. While viewing the videotaped recording from the Tropical Motel's surveillance camera at trial, Martinez identified appellant on the recording. Martinez also explained that on the videotaped recording, movement could be seen on the driver's side of the car toward the passenger's side. According to Martinez, it appeared that "there was some sort of altercation in the vehicle[,] and it appeared . . . to be coming from the driver's side." When appellant exited the car on the front driver's side, a firearm could be seen in his hand, and it appeared to Martinez that appellant "reloaded a gun." Appellant then pointed the firearm back into the car.

Houston Fire Department paramedic Miguel Villarruel testified that on April 11, 2021, he was dispatched to 4831 North Shepherd Drive, and he arrived at the scene at 3:15 p.m. The complainant had been shot in the back of the head. Because the complainant had life-threatening injuries, he was transported to the hospital immediately. The complainant was still alive when he reached the hospital. While treating the complainant, Villarruel did not notice anything in the

6

complainant's pockets, and Villarruel did not see any weapons on the complainant's person.

HPD Officer A. Rudy testified that on April 11, 2021, he responded to a call about a shooting and was tasked with following the ambulance that transported the complainant to the hospital. While at the hospital, the complainant was pronounced deceased. Rudy then collected the complainant's personal items. A nurse, who had been treating the complainant, told Rudy "[T]here's a gun in here," and pointed to the complainant's pants. Rudy found a firearm in the front-right pocket of the complainant's pants. According to Rudy, it was not obvious that there was a firearm in the complainant's pants' pocket; he had to search for it, and he did not see it "right off the bat." The firearm's safety was "not on," and there was a round in the chamber.

Harris County Institute of Forensic Sciences Assistant Medical Examiner Dr. Rafael Garcia testified that he performed an autopsy on the complainant's body on April 12, 2021. According to Dr. Garcia, the complainant's cause of death was "gunshot wounds of the head" and the manner of death was homicide. The complainant had sustained two gunshot wounds to his head. One gunshot wound was on the complainant's right eyebrow, above his right eye, and Dr. Garcia estimated that the muzzle of the firearm was between six inches and four feet away from the complainant's head when the firearm was fired. It was consistent with the

7

shooter firing the shot while seated in the driver's seat of the car. The gunshot wound to the complainant's face would not have rendered the complainant unconscious, and he would have been able to open a car door after sustaining that shot. It was possible for a person who had sustained a gunshot wound like the gunshot wound the complainant sustained to the face to "still be an aggressor to somebody."

Dr. Garcia also testified that the other gunshot wound the complainant sustained was on the "left back portion" of the complainant's head. The bullet that caused this gunshot wound would have entered the "left back portion of the [complainant's] head, traveled through the cranial cavity, perforat[ed] the brain, and then exited on the right frontal scalp." Its trajectory was "back to front, left to right and upward." The complainant's head would have been facing away from the shooter at the time he was shot. Dr. Garcia opined that the complainant would have been rendered immediately unconscious after sustaining the second gunshot wound. He would not have been able to put a firearm back in his pants' pocket after that gunshot nor would he have been able to open a car door. That gunshot wound was fatal. The fact that the complainant could be seen "lying on the ground" before appellant drove off in the videotaped recording of the shooting

8

from the motel's surveillance camera was consistent with him being shot in the back of the head.[4]

Appellant testified that he and the complainant had been friends for about five years and the complainant was "like a big brother" to him. Appellant and the complainant "got along well," "had a lot in common," and "didn't really get into it." The complainant never yelled at him, and they had never had an altercation. Appellant described the complainant as "a good dude."

Appellant further testified that he shot the complainant in the car at the Tropical Motel. And he admitted that it was him who could be seen on the videotaped recording of the shooting from the motel's surveillance camera.

As to the events of April 11, 2021, appellant explained that he called the complainant early that morning to see if the complainant wanted to go to the mall with him. Around 11:00 a.m. or 12:00 p.m., appellant drove to the Tropical Motel to pick up the complainant. When appellant arrived at the complainant's apartment, only the complainant was home, and the two of them started hanging out. While they were hanging out, the complainant showed appellant two firearms that he and Moesha had in their apartment. The complainant put one in the front pocket of his pants and put the other one away. Eventually, Moesha arrived back at the apartment, and appellant and the complainant left to go to the mall. While

---

[4] Dr. Garcia testified that he had used his abilities to recreate what he thought had happened, although he did not know definitively the order of the gunshots.

driving to the mall, appellant and the complainant had normal conversations; there was no conflict between the two of them.

Because the mall was too crowded, appellant and the complainant drove back to the apartment. As they got closer to the apartment, appellant noticed that the complainant was fidgeting and "messing with his pocket." Appellant did not know what the complainant was doing, but he wondered why the complainant "ke[pt] reaching for [his] pocket." Appellant, at the time, knew that the complainant's firearm was in his pants' pocket. Appellant felt confused, and the complainant's responses to appellant "start[ed] getting kind of like he was frustrated or something."

As appellant and the complainant got closer to the apartment, appellant thought to himself, "[p]ay attention," because the complainant was "just being weird." When they got to the apartment, appellant stopped his car in the parking lot because he thought the complainant would get out of the car. Appellant put the car in park because the complainant kept talking. The complainant then yelled at him, "You know what, get out." (Internal quotations omitted.) This "threw [appellant] off" because he had never heard the complainant yell before. The complainant and appellant both opened their car doors. Appellant then got out of the car, and when he looked back, he saw that the complainant had his hand on his pants' pocket and was "trying to pull . . . something out." Appellant thought that

the complainant was "going for his gun so [he] reacted" by "pull[ing] out [his] gun and sh[ooting]" the complainant. According to appellant, he always kept his firearm in his waistband, and he "knew" that if he "wait[ed] to figure out why [the complainant was] going in his pocket," he was "probably not going to make it."

Appellant further explained that when he fired his firearm the first time, the firearm "jammed up," so he "dropped the clip" and "racked the gun back." Appellant then reached down and "picked up the clip and popped it back in and dropped the slide back so [he] didn't have to cock it again." That was when he fired a second shot toward the complainant. At the time appellant fired the second shot, the complainant was still moving "like he was still going for his pocket." Appellant stated that he was "always taught [that] you don't shoot to wound . . . if you going to defend yourself, defend yourself, finish it."

After appellant got back in the car, he pushed the complainant out the front passenger's side door. Appellant started backing up the car, and when he hit the brakes, it caused the front passenger's side door to close. Appellant left the scene because he shot the complainant and he knew that Moesha was at the apartment and had another firearm inside the apartment.

After leaving the apartment, appellant threw his firearm out the window of his car in the middle of the street. He also threw the complainant's cellular telephone, which was still in the car, out the window of his car. The next day,

11

appellant went to a car wash to "clean the blood out of [his] car." Two or three days later, he traded his car at a car lot for a Dodge Charger because he "felt like people w[ere] shooting at [him]." Appellant then traveled to Louisiana because he was "scared to turn [himself] in." While in Louisiana, appellant received a telephone number to contact law enforcement about the shooting. Nine days after the shooting, appellant contacted law enforcement officers, returned to Texas, and turned himself in.

According to appellant, he felt that killing the complainant was "immediately necessary to protect [himself] against [the complainant's] use of unlawful deadly force against [him]" or the complainant's "attempt[ed] . . . use of unlawful deadly force against [him]." Appellant was afraid that the complainant would cause his death or cause him serious bodily injury. Appellant believed that shooting the complainant was immediately necessary to avoid imminent harm from the complainant. Appellant stated that he acted in self-defense because he was scared for his life and he believed it was necessary to kill the complainant.

On cross-examination, appellant testified that the complainant, while in the apartment, openly showed him the two firearms that belonged to him and Moesha. Further, the complainant did not try to hide the fact that he had a firearm with him, and the day of the shooting was not the first time that the complainant carried a firearm around appellant. Appellant always carried a loaded firearm with him, and

12

he had his firearm with him on April 11, 2021. It was tucked into his basketball shorts, with the safety off. The complainant knew that appellant carried a firearm with him.

Appellant further testified that there was no conflict between him and the complainant when they drove an hour to the mall. Appellant had $6,000 in cash in his front-right pocket of his shorts that day. When the complainant started fidgeting with his pants' pocket, the complainant did not pull the handle of his firearm out of the pocket, he just "pulled it towards the top of the pocket." During their car ride back to the apartment, appellant did not ask the complainant what he was doing or why he was fidgeting. Appellant acknowledged that he occasionally adjusted his firearm when he was carrying it.

Appellant also stated that he could not explain "how [the complainant] was getting agitated" while they drove back to the apartment. "He wasn't being his normal self." At the time, appellant was not worried that the complainant would take appellant's money. On their drive, the complainant never took his firearm out of his pocket, and he never pointed it at appellant. He did not make any threats toward appellant while they drove back to the apartment.

Further, when they arrived at the apartment and the complainant told appellant to "[g]et out," the complainant did not have his firearm pointed at appellant. The complainant did not yell anything else at appellant, just "[g]et out."

13

It then only took appellant an "instant" to grab his firearm from his waistband. The first time that appellant fired his firearm a bullet hit the complainant. When appellant bent down to pick up the magazine for his firearm off the ground, the complainant still did not have his firearm out of his pants' pocket and was not attempting to shoot appellant. Appellant did not try to shield himself after his first shot, and he successfully reloaded his firearm. Before firing the second shot, appellant bent down to look inside the car, "[p]ossibly" to get a better shot at the complainant.

Appellant also conceded that he could not remember "exactly how everything happened," and he admitted that he never saw the complainant get his firearm out of his pocket. He acknowledged that the complainant might have tried to "duck" when he saw appellant's firearm, which would have resulted in the first shot hitting the complainant in the face. Appellant did not know what the complainant "was doing" before appellant fired his second shot. According to appellant, he was defending himself from "[s]omebody reaching for a gun in the[ir] pocket that just yelled at [him] to get out of [his] car." Given that a gunshot hit the complainant in the back of the complainant's head, appellant agreed that the complainant was looking away from him when appellant fired the second shot.

After shooting the complainant a second time, appellant got back in his car and pushed the complainant out the front passenger's side door. When appellant

14

pushed the complainant out of the car, the complainant did not have his firearm out of his pocket. Appellant then left the scene.

## Standard of Review

We review complaints of jury-charge error under a two-step process. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). First, we must determine whether error exists in the charge, and second, if error does exist, whether sufficient harm resulted from the error to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. We review a trial court's decision not to submit an instruction in the jury charge for an abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 121–22 (Tex. Crim. App. 2000).

## Jury Charge Error

In his first issue, appellant argues that the trial court erred in denying his request for a jury instruction on the defense of necessity because "[e]vidence was presented at trial that [appellant] believed his conduct was immediately necessary to avoid imminent harm" and "that the urgency of avoiding the harm clearly outweighed the harm sought to be prevented." (Emphasis omitted.) In his second issue, appellant argues that the trial court erred in denying his request for a jury instruction on the State's burden of proof related to the presumption of

reasonableness, as set out in Texas Penal Code section 2.05(b), because "[t]h[at] was the law applicable to the case." (Internal quotations omitted.)

The trial court is required to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. The purpose of the jury charge is to inform the jury of the applicable law and guide the jury in its application to the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

## A. Necessity Instruction

In his first issue, appellant asserts that he believed that killing the complainant was "immediately necessary to protect himself against getting shot," and thus, he properly requested an instruction on the defense of necessity to be included in the trial court's charge to the jury. *See* TEX. PENAL CODE ANN. § 9.22.

A defendant is entitled to a jury instruction on any defensive theory raised by the evidence or testimony when such an instruction is properly requested. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984); *see also* TEX. PENAL CODE ANN. § 2.03(c). Whether the evidence or testimony is presented by the defense or the State is irrelevant, as is the strength of the evidence or testimony. *Booth*, 679 S.W.2d at 500. Whether the record contains such evidence is a question of law, which means that we do not apply the usual rule of appellate deference to the trial

court's ruling. *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). "Quite the reverse, we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

Necessity is a defense of justification as is self-defense. *See* TEX. PENAL CODE ANN. §§ 9.02, 9.22, 9.31, 9.32; *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016); *Alonzo v. State*, 353 S.W.3d 778, 781 (Tex. Crim. App. 2011). The defense of self-defense is set out in Texas Penal Code section 9.31(a), which states that "a person is justified in using force against another [person] when and to the degree the actor reasonably believes the force is immediately necessary to protect [him] against the other[] [person's] use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). Relevant here, under Texas Penal Code section 9.32(a), "[a] person is justified in using deadly force against another [person] . . . if the actor would be justified in using force against the other [person]," as set out in section 9.31, and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other[] [person's] use or attempted use of unlawful deadly force" or "to prevent the other[] [person's] imminent commission of . . . murder, . . . robbery, or aggravated robbery." *See id.* § 9.32(a).

The defense of necessity is set out in Texas Penal Code section 9.22, which provides that conduct that otherwise would be criminal is justified if:

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

*Id.* § 9.22. The first two elements are for the jury to decide, while the third element is a question of law that the jury may not consider. *Williams v. State*, 630 S.W.2d 640, 642–43 (Tex. Crim. App. 1982); *Pennington v. State*, 54 S.W.3d 852, 856–57 (Tex. App.—Fort Worth 2001, pet. ref'd). "[I]f there is a plain legislative purpose to exclude the defense of necessity, then [element] (3) precludes that defense from being included in the [trial court's] charge [to the jury]." *Chase v. State*, 666 S.W.3d 832, 834 (Tex. App.—Tyler 2023, pet. ref'd).

Appellant asserts that the evidence at trial showed that "he believed shooting the [c]omplainant was necessary to avoid being shot himself" and he "believed that the urgency of being shot and killed by [the complainant] was outweighed by [him] shooting [the complainant]." (Internal quotations omitted.) And because this evidence satisfied the first two elements of the necessity defense, he was entitled to an instruction under Texas Penal Code section 9.22. In response, the State asserts

that this was a murder case and "[w]hen deadly force in self-defense is the conduct that [the defendant] alleg[es] [was] immediately necessary under [Texas Penal Code section 9.22(1)], the defense of necessity does not apply." (First alteration in original) (Internal quotations omitted.)

The majority of courts of appeals in Texas that have addressed the propriety of a necessity instruction in a murder case have concluded that a defendant may not raise a necessity defense when deadly force in self-defense is the conduct that the defendant alleges was "immediately necessary" under the first element in Texas Penal Code section 9.22(1) and the jury was instructed as to deadly-force self-defense pursuant to Texas Penal Code section 9.32. *See., e.g.*, *Wilson v. State*, Nos. 05-24-01159-CR, 05-24-01160-CR, 2025 WL 2262404, at *4–5 (Tex. App.— Dallas Aug. 7, 2025, pet. filed) (mem. op., not designated for publication) ("[T]he inclusion of a self-defense instruction to the jury negate[s] the need for a necessity instruction."); *Striblin v. State*, No. 04-17-00826-CR, 2019 WL 1049233, at *4 (Tex. App.—San Antonio Mar. 6, 2019, pet. ref'd) (mem. op., not designated for publication); *Rollins v. State*, 709 S.W.3d 770, 777–80 (Tex. App.—Austin 2025, pet. ref'd); *Sneed v. State*, No. 11-15-00320-CR, 2017 WL 2588164, at *3 (Tex. App.—Eastland Apr. 28, 2017, pet. ref'd) (mem. op., not designated for publication); *Kelley v. State*, No. 05-15-00545-CR, 2016 WL 1446147, at *7 (Tex. App.—Dallas Apr. 12, 2016, pet. ref'd) (mem. op., not designated for publication)

19

("This Court has previously held that in a murder case where self-defense is raised, the defense of necessity does not apply."); *Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at \*4–6 (Tex. App.—Texarkana Nov. 7, 2014, pet. ref'd) (mem. op., not designated for publication) ("Since the trial court charged the jury on self-defense using deadly force, we find that the trial court did not err in refusing to include an instruction on necessity."); *Darkins v. State*, 430 S.W.3d 559, 571–72 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("When deadly force in self-defense is the conduct that is allegedly 'immediately necessary' under [Texas Penal Code] section 9.22, the defense of necessity does not apply."); *see also Rodriguez v. State*, No. 02-17-00371-CR, 2022 WL 2840153, at \*1 n.1 (Tex. App.—Fort Worth July 21, 2022, pet. ref'd) (mem. op., not designated for publication) (citing *Darkins* with approval).

This is because the plain language of the statute governing the defense of deadly-force self-defense—Texas Penal Code section 9.32—"evidences a legislative intent that precludes an accompanying necessity instruction." *Chase*, 666 S.W.3d at 835; *see also Rollins*, 709 S.W.3d at 777–80 ("Because section 9.32 plainly evidences a legislative purpose for excluding the defense of necessity . . . , the trial court did not err in denying the requested jury instruction on necessity."); *Wilson*, 2014 WL 8332264, at \*4–6. As our sister courts have explained, "[a] plain reading of [Texas Penal Code] [s]ection 9.32 shows that the

20

Legislature intended to impose a higher standard for justification of deadly force, permitting its use only when the actor's life is immediately threatened by another[] [person's] use of unlawful deadly force or to prevent the commission of specific violent crimes." *Chase*, 666 S.W.3d at 835 (emphasis omitted); *see also Rollins*, 709 S.W.3d at 780; *Wilson*, 2014 WL 8332264, at *4–6. "A necessity defense involves a substantially lower showing, requiring only that the conduct be necessary to 'avoid imminent harm.'" *Chase*, 666 S.W.3d at 835 (quoting TEX. PENAL CODE ANN. § 9.22(1)); *see also Rollins*, 709 S.W.3d at 780; *Wilson*, 2014 WL 8332264, at *4–6. "Harm" is defined as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." TEX. PENAL CODE ANN. § 1.07(a)(25) (internal quotations omitted). As our sister courts have stated, "allowing an instruction on necessity when the [defendant] used deadly force and obtained a jury instruction on self-defense . . . undermine[s] the legislative purpose of" allowing deadly force to be used only to prevent the immediate threat to one's life or the preventing of the commission of specific violent crimes. *Chase*, 666 S.W.3d at 835; *see also Rollins*, 709 S.W.3d at 780; *Wilson*, 2014 WL 8332264, at *4–6.

We note that the Texas Court of Criminal Appeals has not addressed the question of whether a jury instruction on deadly-force self-defense precludes an

21

instruction on the defense of necessity in a murder case,[5] but in the absence of binding authority from that court, we agree with the majority of Texas appellate courts that have addressed the issue. *See, e.g.*, *Miller v. State*, 712 S.W.3d 235, 255–56 (Tex. App.—Eastland Apr. 17, 2025, pet. filed); *Chase*, 666 S.W.3d at 835–36.

Here, appellant, who was charged with the offense of murder, requested and received an instruction on deadly force self-defense in accordance with Texas Penal Code section 9.32. As such, we hold that the trial court did not err in denying appellant's request for an instruction on the defense of necessity.

We overrule appellant's first issue.

## B.     Presumption-of-Reasonableness Instruction

In his second issue, appellant argues that although the trial court included in its charge to the jury an instruction on self-defense, the instruction was incomplete because the trial court failed to instruct the jury "as to the State's burden of proof regarding the presumption of reasonableness" under Texas Penal Code section 2.05(b), and he was harmed by the trial court's failure to do so.

As noted above, Texas Penal Code section 9.31(a) provides that "a person is justified in using force against another [person] when and to the degree the actor

---

[5]     In *Bowen v. State*, the Texas Court of Criminal Appeals held that a defendant charged with the offense of resisting arrest who did not use deadly force was entitled to both an instruction on self-defense and the defense of necessity. 162 S.W.3d 226, 229–30 (Tex. Crim. App. 2005).

22

reasonably believes the force is immediately necessary to protect the actor against the other[] [person's] use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). Further, Texas Penal Code section 9.32(a) states that if a person is justified in using force under section 9.31, he may use deadly force when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force or to prevent the other person's imminent commission of murder, robbery, or aggravated robbery. *See id.* § 9.32(a). Relevant here, section 9.32(b) states that a person's belief that deadly force was immediately necessary is presumed to be reasonable if the person:

> (1) knew or had reason to believe that the [other] person against whom deadly force was used:
>
> . . .
>
> (B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's . . . vehicle . . . ; or
>
> (C) was committing or attempting to commit [murder, robbery, or aggravated robbery];
>
> (2) did not provoke the [other] person against whom the force was used; and
>
> (3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.* § 9.32(b).

Texas Penal Code section 2.05 instructs the trial court regarding the submission of a presumption to the jury. *See id.* § 2.05; *Kryzak v. State*, No. 05-18-00660-CR, 2019 WL 4027074, at *5 (Tex. App.—Dallas Aug. 27, 2019, no pet.) (mem. op., not designated for publication). Section 2.05(b) concerns a presumption that is favorable to a defendant, and it provides:

> (b)   When [the Texas Penal Code] establishes a presumption in favor of a defendant with respect to any fact, it has the following consequences:
>
> > (1)   if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact; and
> >
> > (2)   if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption, that:
> >
> > > (A)   the presumption applies unless the [S]tate proves beyond a reasonable doubt that the facts giving rise to the presumption do not exist;
> > >
> > > (B)   if the [S]tate fails to prove beyond a reasonable doubt that the facts giving rise to the presumption do not exist, the jury must find that the presumed fact exists;
> > >
> > > (C)   even though the jury may find that the presumed fact does not exist, the [S]tate must prove beyond a reasonable doubt each of the elements of the offense charged; and
> > >
> > > (D)   if the jury has a reasonable doubt as to whether the presumed fact exists, the presumption applies and the jury must consider the presumed fact to exist.

24

TEX. PENAL CODE ANN. § 2.05(b).

It was the trial court's responsibility to deliver to the jury "a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. Here, the trial court instructed the jury on the defense of self-defense and included the presumption-of-reasonableness instruction as set out in Texas Penal Code section 9.32(b) in the self-defense portion of its charge. As such, the trial court was also required to instruct the jury on the State's burden of proof related to the presumption of reasonableness as set out in Texas Penal Code section 2.05(b)(2). *See* TEX. PENAL CODE ANN. § 2.05(b)(2); *Kryzak*, 2019 WL 4027074, at \*6; *see also Hollander v. State*, 414 S.W.3d 746, 753 (Tex. Crim. App. 2013) (Cochran, J., concurring) ("The moral of this story is that trial [courts] should not include a reference to any statutory presumption in the jury charge unless they have very carefully included all of the language of [s]ection 2.05[] of the [Texas] Penal Code which deals with charging the jury on presumptions."). The trial court failed to do so, over appellant's objection. We conclude that the trial court erred in failing to instruct the jury on the State's burden of proof on the presumption of reasonableness pursuant to Texas Penal Code section 2.05(b)(2).

If, as here, appellant preserved his jury-charge complaint by timely objecting to the charge, an appellate court will reverse if appellant shows that he suffered some harm as a result of the error. *Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex.

25

Crim. App. 2009). In demonstrating that "some harm" occurred, appellant must show that he suffered some actual, rather than merely theoretical, harm from the error. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013); *see also Jordan v. State*, 593 S.W.3d 340, 347 (Tex. Crim. App. 2020) (under "some harm" standard, "[r]eversal is required if the error was calculated to injure the rights of the defendant"). We assess harm by considering: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the trial record as a whole. *Reeves*, 420 S.W.3d at 816; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

The trial court's charge instructed the jury on the defense of self-defense, as follows:

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force. The use of force against another is not justified in response to verbal provocation alone.
>
> A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as above set out, and when he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.
>
> . . .

A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force. You are not to consider whether the defendant failed to retreat.

By the term "reasonable belief" as used herein is meant a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

The charge also included a presumption-of-reasonableness instruction that stated:

The defendant's belief that the force was immediately necessary is presumed to be reasonable if the defendant:

(1)     knew or had reason to believe that the person against whom the force was used:

(a)     unlawfully and with force removed, or was attempting to remove unlawfully and with force, the defendant from the defendant's vehicle; or

(b)     was committing or attempting to commit murder, robbery or aggravated robbery;

(2)     did not provoke the person against whom the force was used; and

(3)     was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Further, the application paragraph in the charge instructed:

Therefore, if you find from the evidence beyond a reasonable doubt that [appellant] did shoot [the complainant] with a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of [appellant] at the time, that from the words or conduct, or both of [the complainant] it reasonably appeared to [appellant] that

27

his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of [the complainant], and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against [the complainant's] use or attempted use of unlawful deadly force, he shot [the complainant], then you should acquit [appellant] on the grounds of self-defense; or if you have a reasonable doubt as to whether or not [appellant] was acting in self-defense on said occasion and under the circumstances, then you should give [appellant] the benefit of that doubt and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question [appellant] did not reasonably believe that he was in danger of death or serious bodily injury, or that [appellant], under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against [the complainant's] use or attempted use of unlawful deadly force, then you should find against [appellant] on the issue of self-defense.

Appellant's central complaint on appeal is that the trial court's charge to the jury did not include an instruction explaining: (1) the presumption of reasonableness applied unless "the [S]tate prove[d] beyond a reasonable doubt that the facts giving rise to the presumption d[id] not exist"; (2) "if the [S]tate fail[ed] to prove beyond a reasonable doubt that the facts giving rise to the presumption d[id] not exist, the jury must find that the presumed fact exist[ed]"; and (3) "if the jury ha[d] a reasonable doubt as to whether the presumed fact exist[ed], the presumption applie[d] and the jury must consider the presumed fact to exist." (Internal quotations omitted.)

However, the charge did inform the jury that the State had the burden of proof at trial and that the burden of proof "never shift[ed]" to appellant—indicating that appellant would not have the burden of proof to establish that the presumption applied. Further, the trial court instructed the jury that if it had "a reasonable doubt as to whether or not [appellant] was acting in self-defense," it should give appellant "the benefit of that doubt" and find him not guilty. And the trial court told the jury that it must find appellant "not guilty" unless it found against appellant on the issue of self-defense beyond a reasonable doubt. *See Luck v. State*, 588 S.W.2d 371, 375 (Tex. Crim. App. 1979) ("Clearly, when the charge is viewed as a whole, it placed the burden on the State to show beyond a reasonable doubt that [defendant] was not acting in self-defense."). Accordingly, the jury was instructed to find appellant "not guilty" unless it found beyond a reasonable doubt that appellant did not act in self-defense.

Additionally, we note that had the trial court included appellant's requested instruction on the burden-of-proof as to the presumption of reasonableness, as set out in Texas Penal Code section 2.05(b), then the trial court's charge would have instructed the jury that it was permitted to disregard the presumption and find that it did not apply if the State proved beyond a reasonable doubt that the facts giving rise to the presumption did not exist. *See, e.g.*, *Schule v. State*, No 05-13-01200-CR, 2015 WL 1859040, at *13–14, *16 (Tex. App.—Dallas Apr. 22,

29

2015, no pet.) (mem. op., not designated for publication) (concluding error harmless because if presumption-of-reasonableness instruction had been "properly given to the jury, it would have permitted the jury to disregard the presumption if it found [defendant] did not know or have reason to believe [the complainant] was attempting to murder him or [his son] at the time he used deadly force or that [defendant] provoked [the complainant]" and "[a] complete instruction . . . would have permitted the jury to decide that the presumption did not apply to the facts of [the] case"); *see also Villarreal v. State*, 453 S.W.3d 429, 435 (Tex. Crim. App. 2015) (where trial court's charge did not include presumption-of-reasonableness instruction, related to harm-analysis, stating it must be "take[n] into account that a complete instruction on the presumption of reasonableness would have also informed the jury that, under some circumstances, [defendant] is not entitled to the benefit of the presumption"); *Haye v. State*, No. 01-15-01057-CR, 2017 WL 444462, at *5–6 (Tex. App.—Houston [1st Dist.] Feb. 2, 2017, pet. ref'd) (mem. op., not designated for publication) (where jury charge failed to include presumption-of-reasonableness instruction under Texas Penal Code section 9.32(b), concluding defendant did not suffer "some harm" as result of error and noting "if the jury had been provided with a 'presumption of reasonableness' instruction, the jury would have been able to conclude that the presumption was inapplicable" under evidence presented).

30

Considering the trial court's charge as a whole, it: (1) instructed the jury that the State always had the burden of proof, which never shifted to appellant, (2) instructed the jury on the law of self-defense and the presumption of reasonableness; and (3) instructed the jury that if it had a reasonable doubt regarding self-defense, and unless it believed beyond a reasonable doubt that appellant did not act in self-defense, it should find appellant "not guilty." The jury nonetheless determined beyond a reasonable doubt that appellant did not act in self-defense, rejecting the presumption of reasonableness. Thus, we conclude that this factor's weight is minimal in determining actual harm. *See Villegas v. State*, No. 01-17-00109-CR, 2019 WL 2292982, at *6 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet.) (mem. op., not designated for publication) (in case in which trial court omitted presumption-of-reasonable instruction, explaining "although this factor[,] [the omission of instruction in light of whole charge,] may weigh more heavily in favor of harm in another case, its weight here is minimal").

Turning to the arguments of counsel, the State, in its closing argument, told the jury that it had the burden of proof at trial. The State also stated several times that the issue in the case was self-defense, and it told the jury that in considering whether appellant acted in self-defense, the jury needed to consider whether appellant's actions were reasonable. The State did not address the presumption of

31

reasonableness during its closing argument,[6] and it did not tell the jury that appellant had the burden of proof as to self-defense or that appellant had the burden to prove that the presumption of reasonableness applied.

Appellant's counsel during closing argument told the jury that appellant's belief that force was immediately necessary was presumed reasonable and that the jury had to "assume" that appellant's actions were reasonable in this case.[7] Appellant's counsel also walked the jury through the presumption-of-reasonableness instruction in the trial court's charge, discussing the evidence that showed the presumption applied to this case. Counsel argued that the complainant did not have to point his firearm at appellant for self-defense to apply, but that the complainant's reaching for his firearm was an attempted use of force. Counsel further emphasized that, if the jury had a reasonable doubt as to whether appellant believed there was an imminent threat of deadly force, it had to find in appellant's favor. We conclude the omission of the complained-of instruction did not prevent appellant's counsel from effectively arguing

---

[6] Although the State did not discuss the presumption, it did argue that there was no evidence that the complainant removed appellant from his car by force; there was only evidence that the complainant used verbal provocation by telling appellant to "[g]et out."

[7] To address the State's verbal provocation assertion, appellant's counsel argued that the complainant yelled, "[G]et out," while reaching for his pocket where his firearm was located.

32

self-defense and the presumption of reasonableness. This factor does not weigh in favor of finding actual harm. *See Reeves*, 420 S.W.3d at 816.

As to the evidence at trial, we note that a person commits the felony offense of murder if he intentionally or knowingly causes the death of another person, or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that caused the death of another person. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). Appellant testified that he shot the complainant, and he admitted that it was he who could be seen on the videotaped recording of the shooting from the motel's surveillance camera. *See, e.g.*, *Garner v. State*, No. 03-23-00373-CR, 2025 WL 1559282, at *3 (Tex. App.—Austin June 3, 2025, no pet.) (mem. op., not designated for publication) (jury could find from defendant's admission "that he walked up and shot [the complainant] in the chest" that defendant "either intentionally or knowingly caused [the complainant's] death or only intended to cause [the complainant] serious bodily injury but committed an act clearly dangerous to human life that caused [the complainant's] death").

The only evidence presented as to self-defense was appellant's own testimony that he had acted in self-defense, he was scared that the complainant would cause his death or cause him serious bodily injury,[8] and he believed it was necessary to kill the complainant "to protect [himself] against [the complainant's]

---

[8] During deliberations, the jury requested the trial court to read appellant's testimony about whether he was "scared, threatened or fearful for [his] life."

33

use of unlawful deadly force against [him]" or the complainant's "attempt[ed] . . . use of unlawful deadly force against [him]." *See Angton v. State*, No. 05-14-01038-CR, 2015 WL 6781454, at *4 (Tex. App.—Dallas Nov. 6, 2015, pet. ref'd) (mem. op., not designated for publication) ("It is appropriate to consider the plausibility of the evidence raising self-defense.").

However, appellant also testified that there was no conflict between him and the complainant while they drove an hour together to get to the mall. Further, although appellant stated that the complainant "wasn't being his normal self" on their drive back to the complainant's apartment, kept "messing with his pocket" where his firearm was located, and pulled the handle of his firearm "towards the top of the pocket," appellant could not explain "how [the complainant] was getting agitated" other than he was acting differently. According to appellant, the complainant never took his firearm out of his pocket and never pointed it at appellant. The complainant did not make any threats toward appellant. Appellant also stated that the complainant knew that appellant commonly carried a firearm.

Appellant expressed concern that the complainant yelled "[g]et out" at him when they arrived back at the Tropical Motel, but appellant testified that the complainant did not have his firearm out of his pocket at that time. Instead, appellant testified that, as he exited the car, the complainant, who had already opened the front passenger's side door, remained seated and appeared to be

34

struggling to remove something from his pocket. Yet, in an "instant," appellant had grabbed his firearm out of the waistband of his shorts. The first shot that appellant fired at the complainant hit the complainant. And appellant then had time to fix his firearm that was "jammed up," by "dropp[ing] the clip," reaching down and "pick[ing] up the clip," and "popp[ing] it back in" his firearm. When appellant bent down to pick "the clip" up off the ground, the complainant still did not have his firearm out of his pocket. And, according to appellant, the complainant was not attempting to shoot appellant but was "going for his pocket." Appellant did not need to shield himself after shooting the complainant the first time. As for the second shot, appellant was able to bend down and look inside the car to "[p]ossibly" get a better shot at the complainant. Appellant also testified at length as to the self-defense standard and why he believed he had to use deadly force, explaining it was because the complainant was reaching for his pocket.

Appellant conceded that he could not remember "exactly how everything happened" in the car between him and the complainant, and he admitted that he never saw the complainant get his firearm out of his pocket. He also was not concerned about the complainant robbing him, explaining that the thought that the complainant was going to take his money "really hadn't crossed [his] mind" until "after the fact" and that he now believed that the complainant was trying to take his money. Further, appellant did not know what the complainant "was doing" before

35

appellant shot him a second time. Appellant agreed that the complainant was looking away from him when he fired the second shot because the shot hit the complainant in the back of the head.[9] Appellant also agreed that if the complainant was looking away from him without a firearm out, the complainant did not pose an immediate threat to appellant. Appellant stated that he was "always taught [that] you don't shoot to wound . . . if you going to defend yourself, defend yourself, finish it." *See Haye*, 2017 WL 444462, at *4, *6.

Appellant further testified that after shooting the complainant a second time, he got back in his car and pushed the complainant out the front passenger's side door. When appellant pushed the complainant out of the car, the complainant's firearm was still in his pocket. He backed his car over the complainant and left the scene. After leaving the Tropical Motel, appellant threw his firearm out of the window of his car in the middle of the street. He also threw the complainant's cellular telephone, which was still in the car, out the window. The next day,

---

[9]    Appellant agreed at trial that the first gunshot he fired hit the complainant in the face and the second gunshot was to the back of the complainant's head. Further, Moesha testified that "right" after she heard the first gunshot, she heard car doors open and then a second gunshot, supporting a finding that the complainant was shot in the face first and in the back of the head second. Dr. Garcia, the assistant medical examiner who performed an autopsy on the complainant's body, testified that the complainant would have survived the gunshot wound to his face and would have been able to open his car door after that shot, but he would have been rendered immediately unconscious after being shot in the back of his head. And he would have not been able to put a firearm back in the pocket of his pants after being shot in the back of the head had he had a firearm out before being shot.

36

appellant went to a car wash to "clean the blood out of [his] car." Two or three days later, he traded his car at a car lot for a Dodge Charger. Appellant then traveled to Louisiana because he was "scared to turn [himself] in." Nine days after the shooting, he returned to Texas and turned himself in to law enforcement. The jury could have viewed appellant's actions after the shooting as negating his self-defense claim. *See Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) ("Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn."); *Haye*, 2017 WL 444462, at *4 (flight from scene after shooting constituted evidence jury could consider in rejecting self-defense claim); *Sustaita v. State*, No. 14-09-00060-CR, 2010 WL 3418247, at *4 (Tex. App—Houston [14th Dist.] Aug. 31, 2010, pet. ref'd) (mem. op., not designated for publication) (holding defendant's flight from scene of purported suicide and hiding of firearm were consistent with finding of guilt); *Mendoza v. State*, No. 01-99-00622-CR, 2001 WL 278686, at *3 (Tex. App.—Houston [1st Dist.] Mar. 22, 2001, no pet.) (not designated for publication) ("The jury could have believed that hiding evidence indicated a consciousness of guilt.").

The jury also could have found that the videotaped recording from the motel's surveillance camera weighed against a finding that appellant acted in self-defense. The videotaped recording showed, over the course of around thirteen seconds, appellant exiting his car, turning around to face the direction of the

complainant, pointing his firearm into the car, dropping what appellant said was the firearm's "clip," bending over and picking the "clip" up, reaching into the car with the firearm, and then reentering the car. Notably, appellant stepped out of the car with his back facing the complainant and was not moving in a panicked fashion nor trying to shield himself from any purported attack by the complainant. A reasonable factfinder could conclude appellant was not behaving in the manner of someone in fear for his life.

The jury was not required to believe appellant's testimony that he shot the complainant in self-defense. *Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (jury can choose to disbelieve witness even if witness's testimony is uncontradicted). In light of the videotaped recording of the shooting and appellant's actions after the shooting, we conclude that there was sufficient evidence to support the jury's finding beyond a reasonable doubt that appellant did not act in self-defense when shooting the complainant and that this factor does not weigh in favor of finding actual harm. *See Haye*, 2017 WL 444462, at *6 (in determining defendant did not suffer "any actual . . . harm as a result of the [trial court's jury-charge] error" that evidence was sufficient to support defendant's conviction and sufficient to reject defendant's claim of self-defense).

In sum, the jury was instructed that the State had the burden of proof which never shifted to appellant, that it had to find appellant not guilty if it had even a reasonable doubt as to whether he acted in self-defense, and to presume appellant's belief that force was necessary was reasonable if he knew or had reason to believe the complainant (1) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the defendant from his car or (2) was committing or attempting to commit murder, robbery, or aggravated robbery. With these instructions, and appellant's counsel's arguments as set forth above, the jury found beyond a reasonable doubt that appellant did not act in self-defense. After considering the relevant factors, we conclude that appellant has not shown that he suffered some actual, rather than merely theoretical, harm from the trial court's error in failing to instruct the jury on the State's burden of proof on the presumption of reasonableness pursuant to Texas Penal Code section 2.05(b)(2). *See Reeves*, 420 S.W.3d at 816. Accordingly, we hold that the trial court's error was harmless.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


                           Kristin Guiney
                           Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Publish.  TEX. R. APP. P. 47.2(b).